UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CT-3042-BO

| | | |
|---|---|---|
| NATHANIEL R. WEBB,<br>　　　Plaintiff, | )<br>)<br>) | |
| v. | ) | O R D E R |
| | ) | |
| LYNN BRAWN, et al.,<br>　　　Defendants. | )<br>)<br>) | |

Plaintiff, a state inmate, filed this civil rights action pursuant to 42 U.S.C. § 1983. Defendants have filed a motion to dismiss the action (D.E. 23). Plaintiff was given notice of the motion and timely responded (D.E. 28). The matter is ripe for determination.

Plaintiff asserts several issues: Fourth Amendment violations for illegal search, wrongful arrest, submission of false evidence for the arrest warrant, malicious prosecution, illegal imprisonment, harassment and intentional infliction of emotional distress.

Plaintiff's claims arise out of events from June of 2010 wherein a firearm was found in his residence, he was arrested for possession of the gun, jailed, indicted, and prosecuted.[1] It appears to the court that plaintiff was actually prosecuted for two separate indictments stemming from that period of time. See, Compl. and Attachments. One indictment and subsequent trial was for possession of a firearm by a felon, for which the jury found him not guilty. The second indictment and trial was for felonious child abuse in which he was convicted and is currently

---

[1] The court recognizes defendants mischaracterize this case as one arising from the child abuse criminal prosecution. As stated by plaintiff, this case arises out of a separate felony prosecution and jury trial for the possession of a firearm by a felon. Due to the interrelationship of the facts, the court may properly rule on the motion to dismiss regardless of defendants' error.

incarcerated. There is an appellate opinion from the August 2011 child abuse trial which provides a factual context for the case before this court. That information is as follows:

> The State's evidence at trial tended to show the following. Heather "Nikki" Upchurch and Defendant met and began dating in 2009. Their relationship progressed quickly, and they moved in together when Nikki became pregnant in September of that year. Nikki and Defendant were excited about having their first child together, and Defendant proposed marriage on or around Christmas 2009.
>
> Nikki gave birth to their daughter, S.W., on 18 April 2010. Nikki served as S.W.'s primary caretaker, while Defendant spent most of his time buying and refurbishing cars for resale. When Defendant did interact with S.W., Nikki accused him of being "too rough with her." For instance, Nikki thought Defendant bounced S.W. "too hard or too high" when trying to calm her down, and pulled her legs up too far when changing her diaper. Defendant would get angry and say that he "knew how to handle a baby."
>
> On or about the evening of 30 May 2010, Defendant was changing S.W.'s diaper when he heard her ankle "pop." Defendant brought S.W. to Nikki and told her what had happened, describing the noise as "like a knuckle cracking." Nikki inspected S.W. for injuries, but found none. She observed no swelling, and S.W. appeared able to maneuver her leg through its normal range of motion without discomfort. Nikki "thought [S.W.] was okay."
>
> Later that evening, Defendant and Nikki watched television in the living room with S.W. nearby. S.W. appeared healthy and active, exhibiting no signs of injury. Nikki eventually fell asleep on the couch, with S.W. on her chest. Defendant left the house around midnight to purchase diapers for S.W. and went straight to bed upon his return. Nikki awoke on the couch around 1:30 a.m. and fed S.W. before bringing S.W. to the bedroom where they slept with Defendant. Nikki awoke the next morning and noticed that S.W. seemed unable to straighten her leg. S.W. appeared to be in pain and refused to eat. Nikki feared that she had inadvertently rolled onto her daughter in her sleep. She called her mother, Molly Upchurch ("Ms. Upchurch"), whom she often consulted for parenting advice, and Ms. Upchurch advised her to bring S.W. to the emergency room.
>
> Nikki and Defendant transported S.W. to Western Wake Medical Center ("Western Wake Med") in Cary. Ms. Upchurch and Nikki's sister, Lori Wooten ("Lori"), met them there. X-rays revealed that S.W. had sustained a broken tibia, an injury that could only result from "very significant trauma." Nikki and Defendant told the treating physician that Nikki might have accidentally rolled onto S.W. in her sleep; neither Nikki nor Defendant mentioned the ankle "popping" incident.

2

Wake County Child Protective Services ("CPS") and the Cary Police Department were notified of S.W.'s condition and responded to the emergency room at Western Wake Med. Defendant spoke with them briefly and then left the hospital, telling Nikki that he "was going to sell cars." S.W. was subsequently transported by ambulance to Wake Medical Center in Raleigh ("Wake Med") for further testing. Nikki accompanied S.W. to Wake Med, where S.W. underwent a CAT scan and a full body skeletal exam. Defendant later arrived at the hospital and described the amount of money he had made from the two cars he had sold that day. Nikki told Defendant that he needed to cooperate with CPS and the police. Defendant responded that he did not understand why all this was happening and that if something had happened to S.W., he would be blamed.

Defendant returned to his house that night, while Nikki stayed at Wake Med with S.W. The next day, Nikki and Defendant were both present at Wake Med when S.W.'s test results came back. The tests revealed that S.W. had sustained multiple fractures to her ribs and legs. Nikki vomited when confronted with this information and Defendant also appeared to be in shock. Defendant told Nikki that they "needed to work together to get through this," but Nikki, now believing that S.W.'s injuries could not have been accidental, did not respond.

Neither Nikki nor Defendant was permitted to stay with S.W. that night, as CPS had already removed S.W. from their custody and implemented a visitation plan. CPS placed S.W. in the custody of Lori and Ms. Upchurch, and Nikki and Defendant were permitted supervised visitation for periods of two hours and one hour each day, respectively. Nikki and Defendant were also separated from one another for questioning by Detective Lyn Braun of the Cary Police Department and Danielle Doyle, a social worker with CPS. Nikki disclosed to Detective Braun "the pop [Defendant] had heard" while changing S.W.'s diaper.

Nikki arranged to sleep away from her house that night "[b]ecause [she] didn't want to be around [Defendant]." She returned to her house the next day with a police escort to pick up some of her personal items. Defendant was not at home, but he communicated with Nikki by telephone and told her he was upset that she had brought the police to their house. Defendant later sent "off the wall" and "mumbled" text messages to Nikki, "like he had been drinking." Defendant asked Nikki to tell S.W. "that he loved her . . . and that he was going to sleep" because he had just taken some pills and just wanted to hear [Nikki's] voice. Nikki was concerned and contacted the police.

Detective Michelle Savage of the Cary Police Department responded to Nikki's call and arrived at Defendant's house to find him "laying partially in the hall bathroom and partially in the hallway face down." Defendant was unconscious, but breathing, and was immediately transported to Wake Med. Detective Braun, who also arrived at the scene, searched the home and recovered four empty bottles of sleeping pills

3

from a trash can in the master bathroom. Detective Braun also found an apparent handwritten suicide note in the master bedroom. Defendant spent several days in recovery at Wake Med prior to being committed for psychiatric treatment at Dorothea Dix Hospital in Raleigh.

On or about 21 July 2010, Defendant was released from Dorothea Dix Hospital and escorted to Wake County jail to face charges unrelated to S.W.'s abuse. Defendant was served with a warrant for his arrest on charges of felony child abuse at that time. On 10 August 2010, a Wake County grand jury charged Defendant with "intentionally inflict[ing] and intentionally commit[ting] an assault that resulted in serious physical injury to S.W." and indicted Defendant on one count of felony child abuse inflicting serious physical injury pursuant to N.C. Gen. Stat. § 14–318.4(a).

The matter came on for trial at the 1 August 2011 Criminal Session in Wake County Superior Court, Judge Paul C. Ridgeway, presiding. The State presented testimony from eight witnesses that tended to establish the facts as set out above. Nikki testified that Defendant was too rough with S.W. when he changed her diaper, but she never saw Defendant hit S.W. or assault her in any way. She further testified over objection that Defendant was too rough with their dog, in that he liked to pull the dog's skin and twist it. Nikki also described two instances during May 2010 in which she had left S.W. alone with Defendant so that she could attend her grandmother's wake and funeral. In the first instance, Defendant watched S.W. for approximately 45 minutes without incident. In the second instance, Defendant watched S.W. for approximately two hours, and Nikki recalled being concerned when she spoke with Defendant by telephone because she could hear S.W. crying in the background. Nikki also testified that she visited S.W. two hours each day while S.W. was in Ms. Upchurch's custody, that S.W. had not sustained any injuries since placement with Lori and Ms. Upchurch, and that she (Nikki) had regained custody of S.W. on 28 June 2011.

On cross-examination, Nikki testified that she was S.W.'s primary caretaker and had informed Detective Braun at one point during the investigation that S.W. had not once left her company through the date that she was brought to Western Wake Med for examination. Nikki admitted to making inconsistent statements regarding the precise date on which Defendant heard S.W.'s ankle pop while changing her diaper—whether the incident occurred on a Saturday, Sunday, or Monday, and whether the incident occurred one day or two days before she noticed S.W.'s ankle injury and brought her to the hospital. She also admitted that Defendant had been forthcoming in notifying her of S.W.'s injury and that she did not notice anything wrong with S.W. at the time.

Lori and Ms. Upchurch both testified that Defendant was too rough in handling S.W. Ms. Upchurch described how Defendant pulled S.W.'s legs up to her chest

4

when changing her diaper and how Defendant would shake S.W. to calm her down, even after she told him that he was being too rough. Lori testified that Defendant would bounce S.W. up and down to try to calm her, and that Defendant would say that S.W. liked it when told he was being too rough. Lori also testified that she thought Defendant was controlling, but that she had never seen him strike or harm S.W.

Holly Warner, a nurse practitioner who treated S.W. for her injuries at Wake Med, testified for the State as an expert in pediatric medicine. Ms. Warner testified that S.W.'s multiple fractures were highly specific for child abuse, and that shaking S.W. with "pretty excessive force" could have caused her injuries. She clarified that the amount of force used by someone to console a baby would not have been sufficient to cause S.W.'s injuries, but it was possible that shaking an infant and jerking hard on an infant's leg could have caused S.W.'s rib and leg fractures. Ms. Warner further testified that it was possible, although very unlikely, that rolling over onto an infant would apply sufficient force to cause S.W.'s injuries.

Dr. Elizabeth Whitman, an expert in the field of pediatrics and child abuse, also testified as an expert witness for the State. Dr. Whitman testified that S.W.'s injuries were "exceedingly unusual" in a child and "very specific, highly specific for child physical abuse." She further testified that the degree of force required to cause S.W.'s tibia fracture was that of an automobile accident or a fall from a two-story building.

Defendant did not present any evidence at trial, and his motion to dismiss the charges against him at the close of the State's evidence was denied. On 4 August 2011, the jury returned its verdict finding Defendant guilty as charged. The trial court determined that Defendant was a prior record level IV and sentenced Defendant within the presumptive range of 34 to 50 months' imprisonment. Defendant entered his notice of appeal in open court at the conclusion of sentencing.

State v. Webb, 725 S.E.2d 923, 2012 WL 1995535, * 1-4 (N.C. App. 2012).

A motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A claim is stated if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ___, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating whether a claim is

5

stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). Thus, this plausibility standard requires a plaintiff to articulate facts, that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible he is entitled to relief. Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 129 S.Ct. at 1949, and Twombly, 550 U.S. at 557).

Plaintiff challenges a warrantless search which occurred while he was not at home. By all accounts, the police escorted Heather "Nikki" Upchurch to the residence to gather some of her belongings. Plaintiff does not contest the fact that Upchurch resided in the home until the morning of June 1, 2010, when he and Upchurch took the infant to the hospital. Thus, his allegations are that Upchurch had moved out sometime after June 1st. This event occurred on June 4, 2010. Plaintiff tries to bolster his argument by alleging Upchurch arrived at the home without a key, "broke" into the home by using a credit card on the back door, and allowed the police to search the house for a loaded gun. Plaintiff also states that he spoke to the police and categorically forbid them from entering his residence.

It is clear from the record in the child abuse case, however, that Upchurch did live in the home. Specifically, on May 30, 2010, she resided in the home, and both she and plaintiff took S.W. from their home to the hospital for medical attention on June 1st. From the record before the court, it is clear that she did not return to her home from the hospital due to the pending child

6

abuse investigation. The police escorted her back to her home to retrieve some items. It was at this time, the gun was found.

Thus, plaintiff's challenge to the validity of the warrantless search is without merit. "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant . . . ." Georgia v. Randolph, 547 U.S. 103, 106 (2006) (citations omitted). And while "a physically present cooccupant's stated refusal to permit entry prevails," see id., "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," United States v. Matlock, 415 U.S. 164, 170 (1974). Thus, "if [one tenant] with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Randolph, 547 U.S. at 121. Therefore, "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection," the voluntary consent of the solitary co-tenant will be controlling. Id.

Upchurch gave the accompanying officers permission to search the residence, she was a co-occupant of the residence, and plaintiff was not physically present at the residence. Furthermore, there is no evidence plaintiff was removed from the residence, he was simply not at home. The claim is denied as meritless. Given the dismissal of the core claim, all other claims are likewise denied, as they are interrelated to, and resulted from, the search.

Accordingly, defendants' motion to dismiss (D.E. 23) is GRANTED, and the Clerk is DIRECTED to close the case. Having so determined, all other pending motions are DENIED as MOOT (D.E. 25).

SO ORDERED, this the 22 day of February 2013.

*Terrence Boyle*
TERRENCE W. BOYLE
United States District Judge

8

Case 5:12-ct-03042-BO   Document 32   Filed 02/22/13   Page 8 of 8