UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CT-3042-BO

| | | |
|---|---|---|
| NATHANIEL R. WEBB, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| LYNN BRAWN, et al., | ) | |
| Defendants. | ) | |

This case was brought by pro se plaintiff Nathaniel R. Webb (hereinafter "Webb" or "plaintiff"), pursuant to 42 U.S.C. § 1983. On February 22, 2013, the court granted defendants' motion to dismiss. Order, D.E. 32. On April 28, 2014, the Fourth Circuit reversed the decision solely on the dismissal of the Fourth Amendment claim for failure to state a claim on which relief may be granted. Webb v. Brawn, 568 F. App'x 252 (4th Cir. 2014). Defendants' motion for summary judgment asserting qualified immunity as to the claim is now properly before the court.[1] Mot. for Summ. J., D.E. 53 and 60. Plaintiff was given notice, and he has filed both a response and motion to appoint counsel. Roseboro letter, D.E. 63; Response, D.E. 64, 66, and 67. In this posture, the matter is ripe for determination.

Background and Factual Discussion

Plaintiff's claims arise out of events from June of 2010 wherein a firearm was found at his residence, he was arrested for possession of the gun, jailed, indicted, and prosecuted. See, Compl. and Attach.; see also State v. Webb, 725 S.E.2d 923, 2012 WL 1995535, * 1-4 (N.C. App. 2012). Plaintiff was actually prosecuted under two separate indictments stemming from

---

[1] Qualified immunity was raised as an affirmative defense within the answer. Answer, D.E. 49. This court did not rule on qualified immunity in the prior order, and it is again properly before this court for consideration.

that period of time. Id. One indictment and subsequent trial was for possession of a firearm by a felon, for which the jury found him not guilty. Id. The second indictment and trial was for felonious child abuse, for which he was convicted. Id. He served a period of incarceration on the felonious child abuse conviction. Id.

    i.    This Court's Factual Outline on the Motion to Dismiss

The factual outline within the state's appellate opinion from the child abuse conviction was relied on in the court's prior opinion as follows:

> The State's evidence at trial tended to show the following. Heather "Nikki" Upchurch and Defendant [Webb or plaintiff] met and began dating in 2009. Their relationship progressed quickly, and they moved in together when Nikki became pregnant in September of that year. Nikki and Defendant were excited about having their first child together, and Defendant proposed marriage on or around Christmas 2009.
>
> Nikki gave birth to their daughter, S.W., on 18 April 2010. Nikki served as S.W.'s primary caretaker, while Defendant spent most of his time buying and refurbishing cars for resale. When Defendant did interact with S.W., Nikki accused him of being "too rough with her." For instance, Nikki thought Defendant bounced S.W. "too hard or too high" when trying to calm her down, and pulled her legs up too far when changing her diaper. Defendant would get angry and say that he "knew how to handle a baby."
>
> On or about the evening of 30 May 2010, Defendant was changing S.W.'s diaper when he heard her ankle "pop." Defendant brought S.W. to Nikki and told her what had happened, describing the noise as "like a knuckle cracking." Nikki inspected S.W. for injuries, but found none. She observed no swelling, and S.W. appeared able to maneuver her leg through its normal range of motion without discomfort. Nikki "thought [S.W.] was okay."
>
> Later that evening, Defendant and Nikki watched television in the living room with S.W. nearby. S.W. appeared healthy and active, exhibiting no signs of injury. Nikki eventually fell asleep on the couch, with S.W. on her chest. Defendant left the house around midnight to purchase diapers for S.W. and went straight to bed upon his return. Nikki awoke on the couch around 1:30 a.m. and fed S.W. before bringing S.W. to the bedroom where they slept with Defendant. Nikki awoke the next morning and noticed that S.W. seemed unable to straighten her leg. S.W. appeared to be in pain and refused to eat. Nikki feared that she had inadvertently

2

rolled onto her daughter in her sleep. She called her mother, Molly Upchurch ("Ms. Upchurch"), whom she often consulted for parenting advice, and Ms. Upchurch advised her to bring S.W. to the emergency room.

Nikki and Defendant transported S.W. to Western Wake Medical Center ("Western Wake Med") in Cary. Ms. Upchurch and Nikki's sister, Lori Wooten ("Lori"), met them there. X-rays revealed that S.W. had sustained a broken tibia, an injury that could only result from "very significant trauma." Nikki and Defendant told the treating physician that Nikki might have accidentally rolled onto S.W. in her sleep; neither Nikki nor Defendant mentioned the ankle "popping" incident.

Wake County Child Protective Services ("CPS") and the Cary Police Department were notified of S.W.'s condition and responded to the emergency room at Western Wake Med. Defendant spoke with them briefly and then left the hospital, telling Nikki that he "was going to sell cars." S.W. was subsequently transported by ambulance to Wake Medical Center in Raleigh ("Wake Med") for further testing. Nikki accompanied S.W. to Wake Med, where S.W. underwent a CAT scan and a full body skeletal exam. Defendant later arrived at the hospital and described the amount of money he had made from the two cars he had sold that day. Nikki told Defendant that he needed to cooperate with CPS and the police. Defendant responded that he did not understand why all this was happening and that if something had happened to S.W., he would be blamed.

Defendant returned to his house that night, while Nikki stayed at Wake Med with S.W. The next day, Nikki and Defendant were both present at Wake Med when S.W.'s test results came back. The tests revealed that S.W. had sustained multiple fractures to her ribs and legs. Nikki vomited when confronted with this information and Defendant also appeared to be in shock. Defendant told Nikki that they "needed to work together to get through this," but Nikki, now believing that S.W.'s injuries could not have been accidental, did not respond.

Neither Nikki nor Defendant was permitted to stay with S.W. that night, as CPS had already removed S.W. from their custody and implemented a visitation plan. CPS placed S.W. in the custody of Lori and Ms. Upchurch, and Nikki and Defendant were permitted supervised visitation for periods of two hours and one hour each day, respectively. Nikki and Defendant were also separated from one another for questioning by Detective Lyn Braun of the Cary Police Department and Danielle Doyle, a social worker with CPS. Nikki disclosed to Detective Braun "the pop [Defendant] had heard" while changing S.W.'s diaper.

Nikki arranged to sleep away from her house that night "[b]ecause [she] didn't want to be around [Defendant]." She returned to her house the next day with a police escort to pick up some of her personal items. Defendant was not at home, but he communicated with Nikki by telephone and told her he was upset that she had

3

brought the police to their house. Defendant later sent "off the wall" and "mumbled" text messages to Nikki, "like he had been drinking." Defendant asked Nikki to tell S.W. "that he loved her . . . and that he was going to sleep" because he had just taken some pills and just wanted to hear [Nikki's] voice. Nikki was concerned and contacted the police.

Detective Michelle Savage of the Cary Police Department responded to Nikki's call and arrived at Defendant's house to find him "laying partially in the hall bathroom and partially in the hallway face down." Defendant was unconscious, but breathing, and was immediately transported to Wake Med. Detective Braun, who also arrived at the scene, searched the home and recovered four empty bottles of sleeping pills from a trash can in the master bathroom. Detective Braun also found an apparent handwritten suicide note in the master bedroom. Defendant spent several days in recovery at Wake Med prior to being committed for psychiatric treatment at Dorothea Dix Hospital in Raleigh.

On or about 21 July 2010, Defendant was released from Dorothea Dix Hospital and escorted to Wake County jail to face charges unrelated to S.W.'s abuse. Defendant was served with a warrant for his arrest on charges of felony child abuse at that time. On 10 August 2010, a Wake County grand jury charged Defendant with "intentionally inflict[ing] and intentionally commit[ting] an assault that resulted in serious physical injury to S.W." and indicted Defendant on one count of felony child abuse inflicting serious physical injury pursuant to N.C. Gen. Stat. § 14–318.4(a).

The matter came on for trial at the 1 August 2011 Criminal Session in Wake County Superior Court, Judge Paul C. Ridgeway, presiding. The State presented testimony from eight witnesses that tended to establish the facts as set out above. Nikki testified that Defendant was too rough with S.W. when he changed her diaper, but she never saw Defendant hit S.W. or assault her in any way. She further testified over objection that Defendant was too rough with their dog, in that he liked to pull the dog's skin and twist it. Nikki also described two instances during May 2010 in which she had left S.W. alone with Defendant so that she could attend her grandmother's wake and funeral. In the first instance, Defendant watched S.W. for approximately 45 minutes without incident. In the second instance, Defendant watched S.W. for approximately two hours, and Nikki recalled being concerned when she spoke with Defendant by telephone because she could hear S.W. crying in the background. Nikki also testified that she visited S.W. two hours each day while S.W. was in Ms. Upchurch's custody, that S.W. had not sustained any injuries since placement with Lori and Ms. Upchurch, and that she (Nikki) had regained custody of S.W. on 28 June 2011.

On cross-examination, Nikki testified that she was S.W.'s primary caretaker and had informed Detective Braun at one point during the investigation that S.W. had

4

not once left her company through the date that she was brought to Western Wake Med for examination. Nikki admitted to making inconsistent statements regarding the precise date on which Defendant heard S.W.'s ankle pop while changing her diaper—whether the incident occurred on a Saturday, Sunday, or Monday, and whether the incident occurred one day or two days before she noticed S.W.'s ankle injury and brought her to the hospital. She also admitted that Defendant had been forthcoming in notifying her of S.W.'s injury and that she did not notice anything wrong with S.W. at the time.

Lori and Ms. Upchurch both testified that Defendant was too rough in handling S.W. Ms. Upchurch described how Defendant pulled S.W.'s legs up to her chest when changing her diaper and how Defendant would shake S.W. to calm her down, even after she told him that he was being too rough. Lori testified that Defendant would bounce S.W. up and down to try to calm her, and that Defendant would say that S.W. liked it when told he was being too rough. Lori also testified that she thought Defendant was controlling, but that she had never seen him strike or harm S.W.

Holly Warner, a nurse practitioner who treated S.W. for her injuries at Wake Med, testified for the State as an expert in pediatric medicine. Ms. Warner testified that S.W.'s multiple fractures were highly specific for child abuse, and that shaking S.W. with "pretty excessive force" could have caused her injuries. She clarified that the amount of force used by someone to console a baby would not have been sufficient to cause S.W.'s injuries, but it was possible that shaking an infant and jerking hard on an infant's leg could have caused S.W.'s rib and leg fractures. Ms. Warner further testified that it was possible, although very unlikely, that rolling over onto an infant would apply sufficient force to cause S.W.'s injuries.

Dr. Elizabeth Whitman, an expert in the field of pediatrics and child abuse, also testified as an expert witness for the State. Dr. Whitman testified that S.W.'s injuries were "exceedingly unusual" in a child and "very specific, highly specific for child physical abuse." She further testified that the degree of force required to cause S.W.'s tibia fracture was that of an automobile accident or a fall from a two-story building.

Defendant did not present any evidence at trial, and his motion to dismiss the charges against him at the close of the State's evidence was denied. On 4 August 2011, the jury returned its verdict finding Defendant guilty as charged. The trial court determined that Defendant was a prior record level IV and sentenced Defendant within the presumptive range of 34 to 50 months' imprisonment. Defendant entered his notice of appeal in open court at the conclusion of sentencing.

5

Order , D.E. 32 (citing State v. Webb, 725 S.E.2d 923, 2012 WL 1995535, * 1-4 (N.C. App. 2012)).

    ii.       Fourth Circuit's Factual Outline under the 12(b)(6) standard

In reversing this court's opinion, however, the Fourth Circuit Court of Appeals found the Rule 12(b)(6) facts to be as follows:

> In September 2009, Webb moved into a house with his girlfriend, Heather Upchurch, who co-signed the lease on the home. On April 18, 2010, their daughter, S.W., was born. Six weeks later, on May 31, S.W. was taken to the hospital. The next day, she was diagnosed with multiple fractures to her ribs and legs, and child protective services removed her from her parents' custody. Following an argument with Webb, Upchurch decided to move out of the house and relinquished her house keys to Webb. She then took up residence with her family, approximately 30 miles away. A day or two later, Upchurch sent a friend to Webb's house to retrieve her dog and most of her belongings.
>
> Officer Lynne Brawn of the Town of Cary Police Department investigated Webb and Upchurch for their role in S.W.'s injuries. During a June 4 interview, Upchurch told Officer Brawn that Webb had a gun in his house and that he was a convicted felon. Upchurch also told Officer Brawn that she wanted to collect her remaining belongings from Webb's house. Later that day, Officer Brawn asked Webb if it would be all right if Upchurch went to collect the rest of her belongings from the home, and Webb said that that would be fine. Officer Brawn then informed Webb that Upchurch would be accompanied by uniformed officers. Webb protested, but Officer Brawn responded that Webb had no choice in the matter because this was the department's "procedure." Webb became angry and told Officer Brawn that he "didn't want police cars all over his property" and "didn't want his home to become a public spectacle in view of his neighbors."
>
> Nevertheless, on the evening of June 4, Officers Mark Van Houten and James Smith drove Upchurch from her family's home to Webb's house to collect her belongings. The officers spoke with Officer Brawn, who informed them that there was a loaded weapon in the residence and that Webb was angry about the police going into the house. When Upchurch and the officers arrived at the house, the doors were locked and Webb was not home. Upchurch telephoned Webb and placed him on speaker phone. Webb stated that he did not want police on his property and refused to come home. Webb "received multiple phone calls from . . . [the] officers asking him to come and open the doors" to the house so that Upchurch could retrieve her belongings. Webb continued to refuse, stating that "he did not want them on his property."

6

Officers Smith and Van Houten then "allowed Ms. Upchurch to force entry into the residence by breaking in through a rear door." The officers asked where Webb's gun was located and Upchurch told them it was in the bedroom closet. After Officer Van Houten "search[ed] the residence" and retrieved the weapon, Officer Smith called Officer Brawn to tell her that the weapon had been secured.

Officer Brawn then called Webb and "taunting him, sa[id] that his cooperation was no longer needed, and that they had gotten in[to]" the house by themselves. Webb was angry and said that he would file charges against the officers for unlawfully searching his home without a warrant. When Officer Brawn told Webb that Upchurch was legally able to enter the residence because her name was on the lease, Webb responded that Upchurch had chosen to move out, which was why she no longer had the keys to the house. Officer Brawn "laughed" and said that it didn't matter now because the officers had found the gun and were obtaining a warrant for Webb's arrest. Officer Brawn then went to Webb's house to speak with the other officers and take possession of the weapon.

On June 5, Webb returned to his home to find it ransacked. He was distraught and attempted to commit suicide by taking sleeping pills. Upon his release from the hospital, he was arrested and charged as a felon in possession of a firearm. After a jury trial, he was acquitted of this charge. He was later convicted in state court of felony child abuse and is currently serving his sentence for that crime.[2]

Webb, 568 F. App'x at 253-254.

  iii. Summary Judgment Materials

Now before the court are additional materials in support of defendants' motion for summary judgment. Specifically, defendants' motion is supported by the affidavits of Detective Brawn, Detective Van Houten, Officer Jim Smith, Danielle Doyle, and Heather Upchurch. Given the detailed factual outlines above, the court simply supplements the record with the following factual assertions.

---

[2]The court notes that while the Fourth Circuit held plaintiff to be incarcerated at the time of oral argument and the issuance of the opinion, he had in fact been released on or about June 8, 2013. http://webapps6.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=1163122&searchLastName=webb&searchFirstName=nathaniel&listurl=pagelistoffendersearchresults&listpage=1 (last viewed Feb. 19, 2015); Webb v. Brawn, 4th Cir. Docket # 13-6781, March 19, 2014, Oral Argument ; April 28, 2014, Unpublished Opinion with May 20, 2014 mandate.

7

Before S.W. was transferred to Wake Medical Center Raleigh, Wake County Child Protective Services was contacted by staff at the medical center. Brawn Aff., ¶ 4; Doyle Aff., ¶ 4. Ms. Danielle Doyle, a Child Protective Services ("CPS") social worker, upon receiving the report, contacted Detective Lynne Brawn of the Town of Cary Police Department, requesting that Detective Brawn assist with a child physical abuse allegation at Western Wake Medical Center Cary. Brawn Aff., ¶ 4; Doyle Aff., ¶¶ 5-6.

At Western Wake, Detective Brawn and Ms. Doyle, met with Upchurch and plaintiff, who both denied abuse of S.W., and Ms. Doyle prepared a North Carolina Safety Assessment that was signed by plaintiff and Upchurch. Brawn Aff., ¶ 5; Doyle Aff., ¶¶7-8. The plan included neither parent being left alone with the infant, the requirement that both parents authorize the hospital to run all necessary tests, and that both parents cooperate with Child Protective Services and law enforcement. Doyle Aff., ¶ 8. Criminal background checks were conducted and revealed that plaintiff carried criminal convictions from 2009 for: (1) Possession with Intent to Sell or Distribute Lorazepam, and (2) Possession with Intent to Sell or Distribute Marijuana; among multiple others. Brawn Aff., ¶ 8. Upchurch likewise had a DUI conviction from 2006. Id.

According to Upchurch, plaintiff left prior to S.W.'s transfer to Wake Medical Center for work, but because the family had traveled to the hospital together, and only had one car, Upchurch gave plaintiff her key set, which included her copy of the key to the house. Upchurch Aff. ¶ 12; see also Brawn Aff. ¶ 13. Upchurch stayed at the hospital to be with S.W. that night. Upchurch Aff., ¶ 13.

On Wednesday, June 2, 2010, Detective Brawn and Ms. Doyle met with a nurse and social worker from Wake Medical Center- Raleigh to review the preliminary results from the skeletal survey which showed multiple fractures in different locations in S.W.'s body, in varying stages of healing, along with repeat fractures. Brawn Aff., ¶¶ 9-10; Doyle Aff., ¶12. After meeting with plaintiff, Ms. Doyle wrote-up a second Safety Assessment for both parents to sign. Brawn Aff., ¶ 12; Doyle Aff., ¶ 13. The conditions of the second Safety Assessment were as follows: (1) No visitation with S.W. for Webb; (2) Visitation for only two hours a day for Upchurch to breast feed; and (3) Wake County Child Protective Services would take custody of S.W. Brawn Aff., ¶ 12. Upchurch was not allowed to spend the night at the hospital on June 2, 2010, but her mother and sister did, and she stayed at a family member's home. Upchurch Aff. ¶ 19.

Wake County Child Protective Services ("CPS") took S.W. into the foster care system on June 2, 2010, and gave temporary custody to her maternal grandmother and maternal aunt - both of whom resided in Johnston County, North Carolina. Brawn Aff., ¶ 14; Doyle Aff., ¶ 14. On June 3, 2010, S.W. was discharged by Wake Medical Center - Raleigh, into the custody of her maternal grandmother. Brawn Aff., ¶ 16. Under the terms of the Family Safety Plan, plaintiff was not allowed to see or visit S.W. Brawn Aff., ¶ 16. On June 3, 2010, Upchurch spent the night at a relative's home in Johnston County to be near S.W. and her mother. Upchurch Aff., ¶ 20.

On Friday, June 4, 2010, Upchurch met at the Town of Cary Police Department with Detective Brawn and Ms. Doyle of CPS. Brawn Aff., ¶ 18; Doyle Aff., ¶ 15. During the one hour and 45 minute meeting, Upchurch asked Detective Brawn about retrieving things from the

9

Rental House for S.W., given she had not returned home since June 1, 2010, and was in need of items for S.W.; including, changes of clothes, diapers, wipes, toys, etc. Brawn Aff., ¶ 18; Doyle Aff., ¶ 16; Upchurch Aff. ¶ 21. Detective Brawn advised Upchurch that she wanted uniformed officers to be present when she went to retrieve S.W.'s things from the Rental House. Brawn Aff., ¶ 18; Doyle Aff., ¶ 16. In Detective Brawn's affidavit, she stated the reason for this was two-fold: first, because of the suspicion of child abuse, there was a heightened risk of domestic violence and; second, because of S.W.'s injuries, and the ongoing investigation into the cause of those injuries, police presence would ensure that there would be no destruction of potentially incriminating evidence by Upchurch. Brawn Aff., ¶ 19.

At no time on June 4, 2010, did Detective Brawn or Ms. Doyle recall Upchurch stating that she had moved out of the Rental House. Brawn Aff., ¶ 20; Doyle Aff., ¶ 15. Likewise, Upchurch states that she did not tell the detectives she had moved out. Upchurch Aff., ¶ 23. It was Ms. Doyle's impression that Upchurch had not moved away from the Rental House, and that she had not decided what she wanted to do about her relationship with plaintiff. Doyle Aff., ¶ 15. Upchurch informed Detective Brawn that plaintiff owned and kept a loaded shotgun in the closet of the master bedroom of the Rental House. Brawn Aff., ¶ 18.

Following Detective Brawn's meeting with Upchurch, Detective Brawn and Ms. Doyle met with plaintiff at the Town of Cary Police Department. Brawn Aff., ¶ 21; Doyle Aff., ¶ 15-18. At no time during the interview did plaintiff state to Detective Brawn or Ms. Doyle that Upchurch had moved out of the Rental House. Brawn Aff., ¶ 22. At the conclusion of the interview, Detective Brawn advised plaintiff that Upchurch would be coming to the Rental House that evening to retrieve items for S.W. Doyle Aff., ¶ 18. Plaintiff initially agreed, but then

10

stated he did not want blue lights at his house. Doyle Aff., ¶18; Complaint, ¶ 12. Detective Doyle does not recall plaintiff stating that Upchurch had moved out of the Rental House or had no right to enter the Rental House. Doyle Aff., ¶ 18. Detective Brawn went over the procedure with plaintiff twice, and he confirmed that he understood and advised Detective Brawn that he would be home. Brawn Aff., ¶ 22.

Later on June 4, 2010, Officer James Smith contacted Detective Brawn to advise that he and Detective Mark Van Houten would be accompanying Upchurch to the Rental House. Brawn Aff., ¶ 24; Van Houten, ¶ 5. Detective Brawn advised Officer Smith, for his safety, and the safety of Detective Van Houten, that she had received a report of a loaded firearm being located in the Rental House. Brawn Aff., ¶ 24.

On June 4, 2010, Officer Smith, based on his years of experience dealing with domestic disturbance calls, especially when there had been an incident of suspected abuse, felt that he was being asked to accompany Upchurch to the Rental House because a real threat of domestic violence existed, and that her safety was threatened. Smith Aff., ¶ 10. Officer Smith was concerned about violence as he accompanied Upchurch to the Rental House because of the reported existence of a loaded firearm somewhere in the Rental House. Smith Aff., ¶ 10.

Detective Van Houten, like Officer Smith, knew of the investigation into S.W.'s injuries on June 4, 2010, and believed, based on his years of experience in law enforcement and dealing with domestic disputes that there was a risk of violence as Upchurch retrieved her child's belongings from the Rental House. Van Houten Aff., ¶ 7. Detective Van Houten was also informed that there was a report that there were possible loaded weapons in the Rental House,

11

and as a consequence, requested assistance from other Town of Cary Police officers. Van Houten Aff., ¶ 8. When Detective Van Houten, Officer Smith, Upchurch, and Upchurch's family arrived at the Rental House, it was secure. Smith Aff., ¶ 11; Van Houten Aff., ¶ 9. Officer Smith called plaintiff, asking him to return to the Rental House, but plaintiff hung up on him. Smith Aff., ¶ 11. Upchurch also spoke with plaintiff. Van Houten Aff., ¶ 10; Upchurch Aff. ¶ 27. Detective Van Houten overheard plaintiff tell Upchurch that he knew police were at the Rental House and that he would not return to the Rental House. Van Houten Aff., ¶ 10. Detective Brawn, who was not at the Rental House, called plaintiff, and plaintiff informed her that he would not return to the Rental House and that he was not going to cooperate. Brawn Aff., ¶ 25. Plaintiff did not tell any defendants, nor did any defendants overhear plaintiff tell Upchurch that she was not allowed to enter the Rental House. Brawn Aff., ¶ 25; Smith Aff., ¶ 11; Van Houten Aff., ¶ 11; see also Webb Aff. ¶¶ 1-28.

While Officer Smith and Detective Van Houten waited at the Rental House, Upchurch gained entry and opened the front door of the Rental House and asked Officer Smith and Detective Van Houten to come inside and conduct a safety sweep, as she was concerned that Webb could be lying in wait for her. Smith Aff., ¶¶ 12-13; Van Houten Aff., ¶ 12. Webb was not present at the door to object to their entry. Before conducting a sweep of the Rental House, Officer Smith and Detective Van Houten asked Upchurch to produce a copy of the lease for the Rental House to ensure that she had authority to allow them to enter, which she did. Smith Aff., ¶¶ 13-14; Van Houten Aff., ¶¶ 12-14.

For their safety, before conducting a sweep, Officer Smith and Detective Van Houten asked Upchurch if there were any weapons inside the Rental House. Smith Aff., ¶ 15; Van

12

Houten Aff., ¶ 15]. Upchurch identified a rifle in the master bedroom closet, which Detective Van Houten located. Smith Aff., ¶ 15; Van Houten Aff., ¶ 15-16. The rifle was loaded with 15 rounds of .22 caliber ammunition. Van Houten Aff., ¶ 16. Officer Smith called Detective Brawn to report that Upchurch had been able to enter the Rental House, and that a loaded rifle had been located in the master bedroom closet. Brawn Aff., ¶ 26. Detective Brawn, who was not at the Rental House, then called plaintiff to advise him that Upchurch was able to get into the Rental House without him, and that she would soon return to the police department to take out warrants for plaintiff's arrest for driving while license revoked[3] and for possession of a firearm by a convicted felon. Brawn Aff., ¶ 26.

In response to the affidavits and motion for summary judgment, plaintiff states the following in contradiction to defendants' evidence.[4] Upchurch never had an original copy of the lease, instead an individual named Jose Buitrogo held the lease in his safe. Webb Aff., ¶ 4. Upchurch along with two other individuals, Jose Buitrogo[5] and Jason Hauck had house keys. Id. The alleged child abuse situation "put a lot of stress on Nicki and I, as we were blaming each other." Id., ¶ 12. Therefore, on June 2, 2010, "Nicki told Detective Brawn that she no longer

---

[3]The record references facts surrounding the license issue several times. These factual allegations and disputes have no relevance to the Fourth Amendment issue and are excluded from the decision.

[4]The court recognizes that plaintiff has 28 paragraphs in his affidavit. The court finds it necessary to only set out those paragraphs which tend to contradict defendants' affidavits and version of events for the purposes of summary judgment. The factual allegations surrounding the revocation of license issue are irrelevant to resolution of the Fourth Amendment issue as stated in the prior footnote.

[5]Plaintiff also submits an affidavit of Jose Buitrogo which says plaintiff and Upchurch broke up on June 2, 2010. This affidavit also states that on June 2, 2010, someone other than Upchurch, or the police, removed Upchurch's items from the home.

13

wanted to stay at our house and . . . chose to stay with family." Id. Keys were exchanged, and Detective Brawn acknowledged the surrender of the house keys. Id. Upchurch moved from the residence, although she was not present for the move. Id., ¶ 13. The move was undertaken and done by Upchurch's niece's boyfriend. Id., ¶ 13. Plaintiff states the move is supported by the address given to Detective Brawn in the notation found within the record. Id., ¶ 14. Plaintiff asserts that he did not want police presence on his property because it would create a bad image in the public's view. Id., ¶ 17. Plaintiff "did not own a firearm, shotgun, or otherwise." Id., ¶19. Later, Detective Brawn called him, taunting him, and plaintiff stated he would file a suit for his constitutional rights being violated. Id., ¶ 21.

Plaintiff tenders the police note with the notation "where Nicky Upchurch is staying" as proof that Upchurch had moved from his residence. Id., Ex. A. Lastly, he submits a letter from Wake County Department of Human Services stating that both parents neglected and abused S.W. Id., Ex B.

Legal Discussion

    i.    Summary Judgment

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a

14

Case 5:12-ct-03042-BO   Document 68   Filed 02/20/15   Page 14 of 18

genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted & emphasis removed). A mere scintilla of evidence supporting the case is not enough. Anderson, 477 U.S. at 252. The court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. Matsushita Elec. Indus. Co., 475 U.S. at 586-587. " Id.

    ii.    Qualified Immunity

Defendants assert qualified immunity as to plaintiff's claims. Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); Pearson v. Callahan, 555 U.S. 223, 231–32 (2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Reichle, 132 S. Ct. at 2093; Messerschmidt v. Millender, 132 S. Ct. 1235, 1244–45 (2012); Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011); Pearson, 555 U.S. at 231–32.

The court must ask two questions to determine whether qualified immunity applies. See, e.g., Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232; Evans v. Chalmers, No. 11-1436, 2012 WL 6554846, at *5 (4th Cir. Dec. 17, 2012); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Unus v. Kane, 565 F.3d 103, 123 n.24 (4th Cir. 2009); Miller v. Prince George's Cnty., 475 F.3d 621, 626–27 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). The court decides which question to address first.

15

Pearson, 555 U.S. at 236; see Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080. The court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. The court also must determine "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. (quotation omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al-Kidd, 131 S. Ct. at 2083 (alterations in original) (quotations omitted); see Reichle, 132 S. Ct. at 2093; Anderson v. Creighton, 483 U.S. 635, 640 (1987). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083; see Reichle, 132 S. Ct. at 2093. Defendants are entitled to qualified immunity if the answer to either question is "no." See, e.g., al-Kidd, 131 S. Ct. at 2080; Miller, 475 F.3d at 627; Bostic, 667 F. Supp. 2d at 606.

    iii.    Fourth Amendment

The Fourth Circuit further set out the controlling law as follows:

> The Fourth Amendment generally prohibits law enforcement officers from entering a person's home without a warrant. See U.S. Const. amend. IV; Payton v. New York, 445 U.S. 573, 585 (1980). But "[t]his prohibition does not apply . . . to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (citations omitted). "'Common authority' . . . is not merely a question of property interest. Rather, it requires evidence of 'mutual use' by one having 'joint access or control for most purposes.'" United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007) (quoting United States v. Matlock, 415 U.S. 164, 171 n.7 (1974)).

> Courts assess the validity of this consent based on the "totality of the circumstances." Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001). Relevant factors include whether the individual providing consent resided at the home, whether access to the

16

> property to be searched was secured, and whether the third party possessed the means to access the property. Cf. Buckner, 473 F.3d at 554. The fact that an individual is listed as an occupant of the property is not necessarily dispositive. Compare United States v. Brown, 328 F.3d 352, 356 (7th Cir. 2003) (holding that being named on the lease did not by itself establish authority to consent), with United States v. Backus, 349 F.3d 1298, 1299-1300, 1304 (11th Cir. 2003) (holding that spouse who jointly owned but no longer occupied marital property had authority to consent).

Fourth Circuit Order, D.E. 42. The Fourth Circuit found that for the purposes of Rule 12(b)(6), plaintiff's complaint alleged facts sufficient to support a plausible claim that Upchurch did not possess authority to consent to the search. In holding this, the court found his complaint to allege: "(1) he and Upchurch had broken up and Upchurch no longer resided at the house, (2) Upchurch did not possess a key to the house, (3) the doors to the house were locked when Upchurch arrived with the law enforcement officers, and (4) Upchurch and the officers gained access only by breaking into the house." Id.

With the affidavits now before this court, and construing the evidence in the light most favorable to plaintiff, it is clear that the officers were reasonable in their belief that Upchurch possessed common authority over the premises, had not moved from the home, and had consented to the search. Regardless of whether or not she had in fact moved out of the home sometime between leaving on June 1 with her child and arriving at the emergency room and returning on June 4, it was the reasonable belief of the defendants that she had not moved out of the home shared by Upchurch and plaintiff. See Buckner, 473 F.3d at 555 (if a third party lacks the actual authority to consent to a search, police officers do not violate the Constitution as long as the third party "had [the] apparent authority to consent."). While not dispositive, the officers believed Upchurch had at least a copy of the lease with her name as a resident. Likewise, because she had traveled to the hospital with plaintiff in one vehicle, it was understandable that

17

she now had no key. The documentation relied on by plaintiff, the note with the address at which Upchurch could be found, simply says "where Nicky Upchurch is staying." This does not contradict, but supports, defendants' affidavits that they believed Upchurch was spending the night in the hospital and then with a relative (presumably the relative) to be closer to the child. Furthermore, the evidence that on June 2, 2010, someone other than Upchurch, and outside the knowledge of any police presence, moved Upchurch from the residence, does not alter this conclusion. Such knowledge of a move by a different individual cannot be imputed to the officer defendants, especially in light of their testimony that they believed she resided there, and in fact, by Upchurch's own account that she did reside there and did not tell defendants differently. The belief that the officers could legally enter the residence on June 4, 2010, was reasonable, and the search was not in violation of the Fourth Amendment. Each defendant is shielded by qualified immunity.

Conclusion

Accordingly, defendants' motion for summary judgment (D.E. 53 and 60) is GRANTED, and the Clerk is DIRECTED to close the case. Having so determined, all other pending motions are DENIED as MOOT (D.E. 48).

SO ORDERED, this the __ day of February 2015.

TERRENCE W. BOYLE
United States District Judge